**Papetti Samuels Weiss McKirgan LLP**
Scottsdale Quarter
15169 North Scottsdale Road
Suite 205
Scottsdale, AZ 85254

**Randy Papetti** (State Bar No. 014586)
Direct Dial: 480.800.3525
Email: rpapetti@PSWMlaw.com

**Jennifer Lee-Cota** (State Bar No. 033190)
Direct Dial: 480.800.3528
Email: jleecota@PSWMlaw.com

**Orrick, Herrington & Sutcliffe LLP**
The Orrick Building, 405 Howard Street
San Francisco, CA  94105-2669
Telephone: 415.773.5700

Karen G. Johnson-McKewan* (CA Bar No. 121570)
Email: kjohnson-mckewan@orrick.com

Russell P. Cohen* (CA Bar No. 213105)
Email: rcohen@orrick.com

Ryann R. McMurry* (CA Bar No. 336116)
Email: rmcmurry@orrick.com

**Orrick, Herrington & Sutcliffe LLP**
400 Capitol Mall, Suite 3000
Sacramento, CA 95814-4497
Telephone: 916.329.7966

Megan B. Benton* (CA Bar No. 329299)
Email: mbenton@orrick.com

*Pro hac vice applications forthcoming*

*Attorneys for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT

# IN AND FOR THE STATE OF ARIZONA

| | |
|---|---|
| E.C.B., on behalf of himself and his minor child, J.R., | Case No. |
| Plaintiffs, | **COMPLAINT** |
| v. | |
| United States of America, | **(Jury Trial Demanded)** |
| Defendant. | |

## INTRODUCTION

1.      This action seeks damages for an asylum-seeking family forcibly separated by the United States ("U.S.") government in May 2018: Plaintiffs E.C.B. (hereafter,

Papetti Samuels Weiss McKirgan LLP
Scottsdale Quarter
15169 North Scottsdale Road, Suite 205
Scottsdale, AZ 85254

PSWM

"Elias") and his then eight year old daughter, J.R. (hereafter, "Jocelin.")[1]

2.      In May 2018, federal officers forcibly separated Plaintiff Elias from his daughter Jocelin while they were detained in the Yuma County Detention Center in Yuma, Arizona.  Federal officers removed Jocelin without informing Elias of his daughter's whereabouts.  When Elias asked immigration officers about his daughter's location, the officers told him they were not responsible for looking after her. Unbeknownst to Elias, his daughter was sent across the country to a detention center in Miami, Florida without a parent, guardian, or family member.  For two months she was confined inside the facility, which only heightened the trauma of confinement and separation.  Elias was not permitted to contact her by telephone.

3.      As a result of the government's actions, Elias and Jocelin were separated for nearly five months.  They were subjected to abuse and neglect, which caused them substantial and irreparable harm and trauma, from which they continue to suffer.

4.      This was not just a random act by rogue government officials.  It was an intentional and unconstitutional policy designed to deter Central American families from seeking asylum and refuge in the United States.  And the United States government's actions taken against Elias and Jocelin are consistent with actions taken against numerous other families.

5.      Indeed, several federal officials at the highest levels of the government made repeated public statements acknowledging the policy's purpose: to deter future asylum seekers.  Despite widespread condemnation and a federal court's injunction requiring the government to reunite separated families and halt further separations, then-President Trump continued to defend the policy and family separations.  In fact, even after a nationwide injunction was issued on June 26, 2018, families continued to be separated at the border despite there being no adequate basis to justify their separations.[2]

---

[1] For ease of reference and to protect Plaintiffs' identities, "Elias" and "Jocelin" are pseudonyms.  Plaintiffs will file a separate motion to proceed under pseudonym.

[2] Gabby Del Valle & Jack Herrera, *The Pandemic-Era Rebrand of Family Separation*, NEW REPUBLIC (June 15, 2020), https://newrepublic.com/article/158178/pandemic-era-

As of June 2, 2021, the Interagency Task Force on the Reunification of Families[3] identified 3,913 children the United States government had separated from their families between July 1, 2017 and January 20, 2021.[4]

6.     As was the case with Plaintiffs, during these family separations, children were literally ripped from their parents' arms.  Parents were not informed of their children's whereabouts or who was responsible for their children's well-being.  Parents received horrific phone calls asking whether they were amenable to putting their children up for adoption.  This trauma caused parents to experience severe depression and anxiety, which led many to contemplate or attempt suicide.  Traumatized children were not provided with resources or treatment to address the fear, isolation, and abandonment they experienced or the lasting effects of separation and confinement.

7.     After children were separated from their families, the U.S. Department of Homeland Security ("DHS") deemed separated children to be unaccompanied and transferred them to the Health and Human Services Office of Refugee Resettlement ("ORR"), which is responsible for the long-term care and placement of unaccompanied non-citizen children.[5]  However, DHS failed to take the most basic steps to record which children belonged to which parents, emphasizing the government's utter indifference to

Papetti Samuels Weiss McKirgan LLP
Scottsdale Quarter
15169 North Scottsdale Road, Suite 205
Scottsdale, AZ 85254

PSWM

---

rebrand-family-separation; Daniella Silva, *Migrant Families Still Being Separated at the Border, Report from Texas Group Says*, NBC NEWS (Feb. 20, 2019, 9:01 PM), https://www.nbcnews.com/news/latino/migrant-families-still-being-separated-border-report-texas-group-says-n973766.

[3] On February 2, 2021, President Biden established the Interagency Task Force on the Reunification of Families through Executive Order 14011, with the stated intention of "reunit[ing] children separated from their families at the United States-Mexico border" and revoking former-President Trump's executive order that sought to justify separating children from their parents.  Exec. Order No. 14011, 86 F.R. 8273 (Feb. 5, 2021), *available at* https://www.federalregister.gov/documents/2021/02/05/2021-02562/establishment-of-interagency-task-force-on-the-reunification-of-families.

[4] *Initial Progress Report*, INTERAGENCY TASK FORCE ON THE REUNIFICATION OF FAMILIES (June 2, 2021), *available at* https://www.dhs.gov/sites/default/files/publications/21_0602_s1_family-reunification-task-force-120-day-progress-report.pdf.

[5] Off. of Inspector Gen., U.S. Dep't of Homeland Sec., OIG-18-84, *Special Review – Initial Observations Regarding Family Separation Issues Under the Zero Tolerance Policy*, at 3 (Sept. 27, 2018), https://www.oig.dhs.gov/sites/default/files/assets/2018-10/OIG-18-84-Sep18.pdf (hereinafter "DHS OIG Report I").

3

the lives and well-being of these separated families.  In fact, the federal judge who ordered the government to reunify families in July 2018 noted that the government was more efficient and accurate in tracking *property* than unaccompanied non-citizen minors.[6]

8.      The United States is liable for the conduct that harmed Plaintiffs under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b)(1), 2671, *et seq.* ("FTCA").

9.      Although separated families can never be made whole for the suffering and trauma they experienced, Plaintiffs are, at minimum, entitled to compensatory redress for the immeasurable harms they suffered at the hands of the United States government.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over the subject matter of this Complaint under 28 U.S.C. §§ 1331, 1346(b), and the FTCA, 28 U.S.C. §§ 2671–2680.

11.     On February 14, 2020, Plaintiffs submitted administrative claims to DHS, U.S. Customs and Border Protection ("CBP"), U.S. Immigration and Customs Enforcement ("ICE"), and U.S. Department of Health and Human Services ("HHS"). None of these agencies has made a final disposition on any of the Plaintiffs' administrative claims and, as six months have passed since Plaintiffs' submission of the claims, they are deemed finally denied.  28 U.S.C. § 2675(a).  Accordingly, Plaintiffs have exhausted all potential administrative remedies.

12.     Venue is proper in this District under 28 U.S.C. § 1402(b) as the acts and omissions which are the subject of this Complaint occurred in this District.

## PARTIES

13.     Plaintiffs Elias and Jocelin are Guatemalan nationals currently residing in Guatemala.  Elias was 28 years old at the time of the forced separation described in this

---

[6] *Ms. L. v. U.S. Immigr. & Customs Enf't*, 310 F. Supp. 3d 1133, 1143–44 (S.D. Cal. 2018), *modified*, 330 F.R.D. 284 (S.D. Cal. 2019) ("In effect, these parents have been left 'in a vacuum, without knowledge of the well-being and location of their children, to say nothing of the immigration proceedings in which those minor children find themselves.'") (quoting *United States v. Dominguez-Portillo*, No. EP-17-MJ-4409-MAT, 2018 WL 315759, at *14 (W.D. Tex. Jan. 5, 2018)).

Papetti Samuels Weiss McKirgan LLP
Scottsdale Quarter
15169 North Scottsdale Road, Suite 205
Scottsdale, AZ 85254

PSWM

Complaint. He is the father of Plaintiff Jocelin, who was eight years old at the time of the separation. Elias and Jocelin entered the United States together on or around May 1, 2018, and were separated in Arizona. Elias was detained in Arizona for approximately 21 days before being deported to Guatemala. After being forcibly separated from her father, Jocelin was transferred to and held at a detention facility in Miami, Florida for approximately five months before being reunited with her family (including her father) in Guatemala. Elias and Jocelin currently reside in Guatemala with their immediate family.

14.    Defendant is the United States of America, acting by and through DHS, HHS, and the Department of Justice ("DOJ") (collectively, "federal agencies") of the United States under 28 U.S.C. § 2671, and their employees, officers, agents, including but not limited to CBP and ICE, subcomponent agencies of DHS that are under the direction, authority, and control of the Secretary of Homeland Security; ORR, a subcomponent agency of HHS that is under the direction, authority, and control of the Secretary of Health and Human Services; and the Office of the Attorney General within the DOJ.

15.    The federal officers referenced in this Complaint were at all relevant times employees of the United States, working within the scope and course of their employment with the federal agencies listed above.

16.    DHS employees were responsible for separating Elias from his daughter. DHS employees are also responsible for supervising and managing detained individuals at CBP and ICE facilities, including those located in Arizona where Elias and Jocelin were initially detained.

17.    HHS employees are responsible for supervising and managing the detention of children the government classifies as unaccompanied, including at facilities in Florida where Jocelin was detained while she was separated from her father.

18.    High-ranking officials from DHS, HHS, DOJ, and the White House worked together to design and implement the unlawful and unconstitutional family

5

separation policy, pursuant to which Elias and Jocelin were separated and subjected to significant harm.

19.     At all relevant times, all DHS, CBP, and ICE employees referenced in this Complaint who interacted with Plaintiffs were acting as investigative or law enforcement officers.  28 U.S.C. § 2680(h).

## STATEMENT OF FACTS

### A.     THE FAMILY SEPARATION POLICY

20.     The United States developed and implemented an inhumane policy that took thousands of children from their parents for the purpose of deterring future immigrants from seeking asylum in the United States.  This policy was specifically enacted to cause immense trauma and harm to these families, in violation of the United States Constitution and common law.  The House Committee on the Judiciary has referred to this policy as one marked by "reckless incompetence and intentional cruelty."[7]

#### 1.     The Purpose of the Family Separation Policy Was to Deter Future Central American Asylum Seekers

21.     A central tenet of the Trump administration's immigration policy was to deter Central Americans from seeking asylum and refuge in the United States.[8]

___

[7] H.R. Judiciary Comm., *The Trump Administration's Family Separation Policy: Trauma, Destruction, and Chaos*, at 2 (Oct. 2020), https://judiciary.house.gov/uploadedfiles/the_trump_administration_family_separation_p olicy_trauma_destruction_and_chaos.pdf?utm_campaign=4526-519 (hereinafter "House Committee Report").

[8] *See, e.g.,* Kevin Lemarque, *US Judge Bars Trump Administration From Enforcing Asylum Ban*, CNBC (Nov. 20, 2018, 2:04 AM), https://www.cnbc.com/2018/11/20/immigration-policy-judge-bars-us-from-enforcing-trump-asylum-ban.html; Shaw Drake & Edgar Saldivar, *Trump Administration Is Illegally Turning Away Asylum Seekers*, ACLU (Oct. 30, 2018, 1:30 PM), https://www.aclu.org/blog/immigrants-rights/trump-administration-illegally-turning-away-asylum-seekers; Emma Platoff, Alexa Ura, Jolie McCullough & Darla Cameron, *While Migrant Families Seek Shelter from Violence, Trump Administration Narrows Path to Asylum*, TEX. TRIB. (July 10, 2018, 12:00 AM), https://www.texastribune.org/2018/07/10/migrant-families-separated-border-crisis-asylum-seekers-donald-trump/; Glenn Thrush, *U.S. to Begin Blocking Asylum Seekers From Entering Over Mexican Border*, N.Y. TIMES (Jan. 24, 2019), https://www.nytimes.com/2019/01/24/us/politics/migrants-blocked-asylum-trump.html; Yeganeh Torbati & Kristina Cooke, *Trump Administration Moves to Curb Migrants'*

Papetti Samuels Weiss McKirgan LLP
Scottsdale Quarter
15169 North Scottsdale Road, Suite 205
Scottsdale, AZ 85254

PSWM

22.    As early as February 2017, a proposal to routinely separate asylum-seeking parents from their children at the border was discussed at a meeting between senior federal officials from ORR, DOJ, CBP, and ICE at the office of the CBP Commissioner.[9]

23.    By mid-2017, the Trump administration began separating children from their families as part of a "pilot program" in El Paso, Texas (the "El Paso Initiative").[10]

24.    As part of the El Paso Initiative, any adult who illegally crossed the border was detained and criminally charged with a misdemeanor.  If the parent had a child, that child was taken from them and designated as an unaccompanied minor.  The government then proceeded to place these children into the custody of ORR.[11]  Parents were unable to communicate with their children because the government failed to properly track separated families, nor did the federal agencies or their employees establish a system to reunify families after separation.[12]  CBP separated approximately 280 families from July to November 2017 — "an increase from prosecuting 0 percent of adults with a family

---

*Asylum Claims*, REUTERS (Nov. 8, 2018), https://www.reuters.com/article/us-usa-immigration-asylum/trump-administration-moves-to-curb-migrants-asylum-claims-idUSKCN1ND35K.

[9] *See* H.R. Subcomm. on Oversight & Investigations, Comm. on Energy & Com., Unofficial Hr'g Tr. at 1012–24, 1131–38, 2058–64 (Feb. 7, 2019), https://energycommerce.house.gov/sites/democrats.energycommerce.house.gov/files/documents/HIF038.020%20-%20OI%20-%20Hrg%20-%202019%20Feb%2007%20-%20UNEDITED.pdf (testimony of Commander Jonathan White, U.S. Pub. Health Serv. Commissioned Corps, U.S. Dep't of Health & Human Servs.) (hereinafter "White Testimony").

[10] Southern Poverty Law Center, *Family Separation Under the Trump Administration*, SPLC (June 17, 2020), https://www.splcenter.org/news/2020/06/17/family-separation-under-trump-administration-timeline; *see also* Julia Edwards Ainsley, *Exclusive: Trump Administration Considering Separating Women, Children at Mexico Border*, REUTERS (Mar. 3, 2017, 12:13 PM), https://www.reuters.com/article/us-usa-immigration-children/exclusive-trump-administration-considering-separating-women-children-at-mexico-border-idUSKBN16A2ES ("[DHS] continually explores options that may discourage those from even beginning the journey" north from Central America to the U.S. border).

[11] *See, e.g.*, *United States v. Dominguez-Portillo*, No. 17-MJ-4409, 2018 WL 315759, at *1 (W.D. Tex. Jan. 5, 2018), *aff'd sub nom.*, *United Sates v. Vasquez-Hernandez*, 314 F. Supp. 3d 744 (W.D. Tex. 2018), *aff'd*, 924 F.3d 164 (5th Cir. 2019).

[12] House Committee Report, *supra* note 7, at 9–10, 21.

*(left margin)* Papetti Samuels Weiss McKrigan LLP
Scottsdale Quarter
15169 North Scottsdale Road, Suite 205
Scottsdale, AZ 85254

PSWM

Papetti Samuels Weiss McKirgan LLP
Scottsdale Quarter
15169 North Scottsdale Road, Suite 205
Scottsdale, AZ 85254

PSWM

the month before the initiative began to prosecuting 15 percent during the initiative."[13]

25.     During the El Paso Initiative, judges, prosecutors, and advocates voiced concern that children were being separated from their parents, and that separated families were given no information about each other's whereabouts or well-being.[14]

26.     Prior to the El Paso Initiative, unaccompanied minors who arrived at ORR were typically those who had arrived in the U.S. unaccompanied by a parent or guardian. Historically, as no parent or guardian accompanied the newly-arrived minors, ORR had no need to (and did not) track the relationship between unaccompanied minors in its care to their parents.

27.     When the El Paso Initiative began, minors who *were* accompanied by a parent or guardian when they arrived in the U.S. were forcibly separated from their parent or guardian and were then falsely and incorrectly classified by CBP as "unaccompanied."

28.     Despite the novel need to track these new "unaccompanied" minors in its care to their parents and guardians in DHS custody, ORR did not implement a method for tracking separated children and parents.

29.     At the conclusion of the El Paso Initiative, CBP headquarters became aware of a "deficiency" in its records systems that prevented government officials from tracking separated children and their parents.[15]  Although CBP headquarters was aware of this deficiency, they failed to implement any changes to the records systems, leading to a catastrophic failure to reunite families separated under the Trump administration's

---

[13] Off. of Inspector Gen., U.S. Dep't of Homeland Sec., OIG-20-06, *DHS Lacked Technology Needed to Successfully Account for Separated Migrant Families*, at 14 (Nov. 25, 2019), https://www.oig.dhs.gov/sites/default/files/assets/2019-11/OIG-20-06-Nov19.pdf (hereinafter "DHS OIG Report II").

[14] Off. of Inspector Gen., U.S. Dep't of Justice, 21-028, *Review of the Department of Justice's Planning and Implementation of its Zero Tolerance Policy and its Coordination with the Departments of Homeland Security and Health and Human Services*, at 32 (Jan. 2021), https://oig.justice.gov/sites/default/files/reports/21-028_0.pdf (hereinafter "DOJ OIG Report").

[15] DHS OIG Report II, *supra* note 13, at 14.

8

later-enacted zero-tolerance policy.[16]

30.   By late 2017, the government was separating families in targeted parts of the U.S.-Mexico border, including families arriving through official ports of entry. Despite the fact that ORR voiced concerns about lacking the systems needed to handle an increase in children that had been separated from their parents and re-classified as unaccompanied, ORR was specifically instructed not to take steps to prepare for future increases, given that there was no official "policy" of separating families.[17]

31.   In December 2017, senior Justice Department officials and DHS exchanged a memorandum entitled "Policy Options to Respond to Border Surge of Illegal Immigration."[18]  The memorandum made clear that the Trump administration intended to pursue a policy whereby they would separate family units and prosecute parents.[19]

32.   In a section titled "Separate Family Units," the memorandum stated that adults would be placed in adult detention while children would be placed in HHS custody.[20]  In another section entitled "Increased Prosecution of Family Unit Parents," the memorandum stated that "parents would be prosecuted for illegal entry . . . and the minors present with them would be placed in HHS custody as [unaccompanied minors]."[21]  The memorandum further stated that "the increase in prosecutions would be

---

[16] *Id.* at 14–15.

[17] *See* White Testimony, *supra* note 9.

[18] *Policy Options to Respond to Border Surge of Illegal Immigration* (Dec. 16, 2016), https://www.splcenter.org/sites/default/files/72.6_-_3d_am.compl_._exh._5_leaked_memo_01-18-2019.pdf (hereinafter "Policy Options"); *see also* Priscilla Alvarez, *What the 2017 Draft Memo Reveals About the Administration's Family Separations Policy*, CNN (Jan. 18, 2019, 1:47 PM), https://www.cnn.com/2019/01/18/politics/draft-memo-significance/index.html.

[19] In addition to this memorandum, then-Secretary of Homeland Security Kirstjen Nielsen also initiated efforts to formally develop and implement a family separation policy.  *See* House Committee Report, *supra* note 7, at 10.

[20] *Policy Options*, *supra* note 18.

[21] *Id.*

Papetti Samuels Weiss McKirgan LLP
Scottsdale Quarter
15169 North Scottsdale Road, Suite 205
Scottsdale, AZ 85254

PSWM

1    reported by the media and it would have substantial deterrent effect."[22]

2        33.    Notwithstanding the concerns expressed by prosecutors, judges, and others

3    about the implementation of the El Paso Initiative, on April 6, 2018, the Trump

4    administration's Attorney General Jeff Sessions issued a memorandum to all federal

5    prosecutors entitled "Renewed Commitment to Criminal Immigration Enforcement,"

6    which mandated that each United States Attorney's Office issue a "zero-tolerance"

7    policy.   A zero-tolerance policy required the prosecution of all noncitizens who crossed

8    the United States border between ports of entry with misdemeanor improper entry under

9    8 U.S.C. § 1325.  The announcement of the zero-tolerance policy "referenc[ed] the [El

10   Paso] Initiative as a basis for expanding referrals of family unit adults throughout the

11   Southwest border," while ignoring "the challenges encountered during the El Paso

12   Initiative, including the government's inability to reunify separated families."[23]

13       34.    Also on April 6, 2018, then-President Trump issued a Presidential

14   Memorandum entitled "Ending 'Catch and Release' at the Border of the United States

15   and Directing Other Enhancements to Immigration Enforcement."[24]  This memorandum

16   directed the Secretary of Homeland Security, the Secretary of Defense, the Attorney

17   General, and the Secretary of HHS to submit a report to the President identifying all of

18   the measures the various departments had implemented to **end** "Catch and Release"

19   practices.

20       35.    On May 4, 2018, citing "recent presidential direction and guidance from

21   the Attorney General," the DHS Secretary executed a memorandum directing Border

22   Patrol sectors to "refer for prosecution all adults apprehended for crossing the border

23   illegally," expressly including parents who entered the United States with their

24   children.[25]

25   _____

26   [22] *Id.*

     [23] DOJ OIG Report, *supra* note 14, at 22, 31–32.

27   [24] 83 Fed. Reg. 16, 179.

28   [25] DOJ OIG Report, *supra* note 14, at 32.

Papetti Samuels Weiss McKirgan LLP
Scottsdale Quarter
15169 North Scottsdale Road, Suite 205
Scottsdale, AZ 85254

PSWM

36.     In prior administrations, asylum seekers, especially families, had not been systematically referred for prosecution for the misdemeanor of crossing the border illegally.[26]  Instead, DHS would either detain and administratively remove the family from the United States or give the family a Notice to Appear before an Immigration Judge and release them on their own recognizance into the community where they would await their hearing in Immigration Court.[27]  This latter practice became derogatorily known as "Catch and Release."

37.     Over the last 20 years, fewer than one-third of apprehensions by CBP have resulted in criminal prosecutions, and any sentences imposed have tended to be short, ranging from two to 15 days.[28]

38.     Against that backdrop, the purpose of the zero-tolerance policy was clear. It was enacted to deter individuals from seeking asylum or otherwise coming to the United States.  The Trump administration intended to deter further immigration by separating families and causing these individuals irreparable suffering and trauma, with no mechanism in place to reunify separated families.[29]

39.     The United States government knew that the zero-tolerance policy would cause enormous trauma for these families – indeed, the cruelty of the policy was the point.[30]  For example, in September 2016, the DHS Advisory Committee on Family

[26] This was done, in part, to conserve the resources of DOJ prosecutors and avoid having them take on misdemeanor prosecutions.  *See* DOJ OIG Report, *supra* note 14.

[27] *Id.* at 1–2.

[28] *"Zero Tolerance" at the Border: Rhetoric vs. Reality*, TRAC (July 24, 2018), https://trac.syr.edu/immigration/reports/520/.

[29] DHS OIG Report II, *supra* note 13, at 14 n.20.

[30] Laura Santhanam, *How Detention Causes Long-Term Harm to Children*, PBS (Aug. 22, 2019, 6:18 PM), https://www.pbs.org/newshour/health/how-detention-causes-long-term-harm-to-children ("[Pediatrician] Linton also saw regressive behavior and cognitive delays emerge from detained children soiling themselves, detachment, temper tantrums in older children, rolling back speech milestones and difficulty completing tasks. No amount of time in detention is safe for immigrant children, she said."); *see also* Hajar Habbach, MA, Kathryn Hampton, MSt, and Ranit Mishori, MD, MHS, *"You Will Never See Your Child Again" The Persistent Psychological Effects of Family Separation*, PHR (Feb. 25, 2020), https://phr.org/our-work/resources/you-will-never-see-your-child-again-the-persistent-psychological-effects-of-family-separation/ ("PHR finds that the U.S. government's treatment of asylum seekers through its policy of family separation

Papetti Samuels Weiss McKirgan LLP
Scottsdale Quarter
15169 North Scottsdale Road, Suite 205
Scottsdale, AZ 85254

PSWM

Papetti Samuels Weiss McKirgan LLP
Scottsdale Quarter
15169 North Scottsdale Road, Suite 205
Scottsdale, AZ 85254

PSWM

Residential Centers issued a report concluding that "the detention or the separation of families for purposes of immigration enforcement or management, or detention is never in the best interest of children.  DHS should discontinue the general use of family detention…."[31]  Additionally, Commander Jonathan White, former Deputy Director of ORR for the Unaccompanied [Noncitizen] Children's program, testified before Congress that he had repeatedly warned those devising the policy that family separations could lead to significant harm and trauma.[32]

40.     Several officials' comments on the policy further confirmed its goal was to harm families through forcible and prolonged separation to deter immigration to the United States.  On May 11, 2018, John Kelly, President Trump's then-Chief of Staff, said to NPR that "a big name of the game is deterrence. . . . It could be a tough deterrent—would be a tough deterrent.[33]  The children will be taken care of—put into foster care *or whatever*."[34]

41.     On June 19, 2018, Steven Wagner, Assistant Secretary of HHS, stated "[w]e expect that the new policy will result in a deterrence effect, we certainly hope that parents stop bringing their kids on this dangerous journey and entering the country illegally."[35]

---

constitutes cruel, inhuman, and degrading treatment and, in all cases evaluated by PHR experts, rises to the level of torture.").

[31] U.S. Immigr. & Customs Enf't, Dep't of Homeland Sec., *Rep. of the DHS Advisory Committee on Family Residential Centers*, at 2, 10 (Sept. 30, 2016), https://www.ice.gov/sites/default/files/documents/Report/2016/ACFRC-sc-16093.pdf.

[32] Jeremy Stahl, *The Trump Administration Was Warned Separation Would Be Horrific for Children, Did it Anyway*, SLATE (July 31, 2018, 5:05 PM), https://slate.com/news-and-politics/2018/07/the-trump-administration-was-warned-separation-would-be-horrific-for-children.html.

[33] *Transcript: White House Chief of Staff John Kelly's Interview with NPR*, NPR (May 11, 2018, 11:36 AM), https://www.npr.org/2018/05/11/610116389/transcript-white-house-chief-of-staff-john-kellys-interview-with-npr.

[34] *Id.* (emphasis added).

[35] Phillip Bump, *Here Are the Administrative Officials Who Have Said That Family Separation is Meant as Deterrent*, WASH. POST (June 19, 2018, 9:14 AM), https://www.washingtonpost.com/news/politics/wp/2018/06/19/here-are-the-administration-officials-who-have-said-that-family-separation-is-meant-as-a-deterrent/.

42.     On October 13, 2018, former President Trump said to reporters that "if [immigrants] feel there will be separation, they don't come."[36]  And again on December 16, 2018, then-President Trump tweeted, "if you don't separate, FAR more people will come."[37]

43.     Despite these public statements, the government claimed it had to separate families because children could not be housed in jails after their parents were prosecuted for illegally crossing the border.  This rationale was pretextual.  The government's policy of separating children was a mandatory policy that, as implemented, required CBP and ICE agents to separate children from their families, ***even if the parents were not targeted for prosecution***, as was the case with Plaintiffs Elias and Jocelin.

44.     A two-year inquiry by the Justice Department's inspector general confirmed the policy's pretextual rationale in a January 2021 report.  The report revealed that in May 2018, then-Attorney General Sessions told U.S. attorneys on a conference call, "We need to take away children."[38]  "If [sic] care about kids, don't bring them in. Won't give amnesty to people with kids."[39]  Also in May 2018, talking points drafted for Mr. Sessions for use at a White House meeting explained that "DHS should consider . . . *administrative* separation of family units," even where the parent is not referred for prosecution.[40]

45.     The report further revealed that Rod Rosenstein, then-Deputy Attorney

---

[36] *Remarks by President Trump Before Marine One Departure*, LEGISTORM (Oct. 13, 2018, 3:52 PM), https://www.legistorm.com/stormfeed/view_rss/1369143/organization/69295.html.

[37] Donald Trump (@realdonaldtrump), TWITTER (Dec. 16, 2018, 11:24 AM), https://twitter.com/realDonaldTrump/status/1074339834351759363 (emphasis in original).

[38] DOJ OIG Report, *supra* note 14, at 39; *see also* Michael D. Shear, Katie Benner & Michael S. Schmidt, "'*We Need to Take Away Children,' No Matter How Young, Justice Dept. Officials Said*, N.Y. TIMES (Oct. 6, 2020), https://www.nytimes.com/2020/10/06/us/politics/family-separation-border-immigration-jeff-sessions-rod-rosenstein.html?referringSource=articleShare.

[39] Shear, Benner & Schmidt, *supra* note 38.

[40] DOJ OIG Report, *supra* note 14, at 30–31.

General, went even further on a subsequent call, telling U.S. attorneys that "it did not matter how young the children were" and "government lawyers should not have refused to prosecute two cases simply because the children were barely more than infants."[41]

46.     Both Mr. Sessions and Mr. Rosenstein knew that strict implementation of the zero-tolerance policy would result in DHS changing its longstanding policy and referring for criminal prosecution adult family unit members who entered the country with children without regard for the separation of families.[42]

47.     Likewise, after a nearly two-year investigation, the House Committee on the Judiciary issued a report concluding that "[w]ithin weeks of President Trump's inauguration, the Administration began formulating a plan to separate parents from their children as a means to deter migration."[43]  Before a formal policy had even been developed, "the Administration was accelerating family separations."[44]

48.     According to officials involved in orchestrating the zero-tolerance policy, then-President Trump's senior adviser Stephen Miller "saw the separation of families not as an unfortunate byproduct but as a tool to deter more immigration," and "with the support of [Attorney General] Sessions, advocated for separating all immigrant families, even those going through civil court proceedings."[45]

49.     Thus, from the policy's earliest days, Justice Department officials understood and ***encouraged*** the separation of children as an expected part of the desire to prosecute all undocumented immigrants crossing the border.  Mr. Sessions and other senior department officials "were aware that full implementation of the zero-tolerance

[41] Shear, Benner & Schmidt, *supra* note 38.

[42] DOJ OIG Report, *supra* note 14, at 8.

[43] House Committee Report, *supra* note 7, at 21.

[44] *Id.* ("By March 2017, the number of separated children transferred to ORR custody had increased by nearly 900 percent, as compared to November 2016.").

[45] Julia Ainsley & Jacob Soboroff, *Trump Cabinet Officials Voted in 2018 White House Meeting to Separate Migrant Children, Say Officials*, NBC News (Aug. 20, 2020, 12:15 PM), https://www.nbcnews.com/politics/immigration/trump-cabinet-officials-voted-2018-white-house-meeting-separate-migrant-n1237416.

Papetti Samuels Weiss McKirgan LLP
Scottsdale Quarter
15169 North Scottsdale Road, Suite 205
Scottsdale, AZ 85254

PSWM

14

policy would result in criminal referrals by D.H.S. of adults who enter the country illegally with children and that the prosecution of these family-unit adults would result in children being separated from families."[46]

### 2. The Implementation of the Family Separation Policy and the Illegal and Inhumane Conditions of the Detention Facilities

50.    On the ground in Arizona and elsewhere, the government effectuated family separations in a cruel and brutal fashion.  Many children were forcibly taken from their parent's arms over the pleas of both parent and child.  This compounded the stress and anxiety on other families who witnessed these separations, as they felt it was only a matter of time before the government separated them.  Parents were lied to and deceived, like Plaintiff Elias who was told he and his daughter would be reunited in Texas.  His daughter was instead sent to Miami, Florida—a place Plaintiff Elias had never heard of. All of the parents were left with little to no information for hours, days, weeks, and months as to where their children were, how they were doing, and if and when they would be reunited.

51.    Once families were separated, the government classified the children as "unaccompanied," even though these children had been accompanied by their guardians until the government separated them.  These children were then transferred into ORR custody, which is responsible for the long-term care and placement of "unaccompanied [non-citizen] children."  *See* 6 U.S.C. § 279(a).  During these prolonged separations, children were prevented from talking with their parents for weeks or months, which also heightened their trauma.  Indeed, after family separations began without advance notice to the U.S. Marshals Service ("USMS"), the USMS did not have policies or procedures to facilitate communications between migrant children in HHS ORR custody and their parents in USMS custody, which resulted in delays in establishing contacts between separated family members.[47]  For many children, communication came only after the

---

[46] Shear, Benner & Schmidt*, supra* note 38; *see also* DOJ OIG Report, *supra* note 14.

[47] *See* DOJ OIG Report, *supra* note 14, at 58.

Papetti Samuels Weiss McKirgan LLP
Scottsdale Quarter
15169 North Scottsdale Road, Suite 205
Scottsdale, AZ 85254

child's case worker or lawyer tracked down their parents.

52.      Once separated, parents and children also had to endure squalid and inhumane conditions at these detention facilities.  The conditions at the detention centers—the kind in which Elias and his minor daughter were held—have been widely documented and deemed unconstitutional.

53.      A July 2019 report from DHS's Office of the Inspector General (the "July OIG Report") described standing-room-only cells, children without showers and hot meals, and detainees begging for release.[48]  The report further revealed that children had "few spare clothes and no laundry facilities."  Many migrants were given only wet wipes to clean themselves and bologna sandwiches to eat, causing constipation and other health problems.[49]

54.      The July OIG report described overcrowding so severe that when the agency's internal inspectors visited some of the facilities, migrants banged on cells and pressed notes to windows begging for help.  At one facility, some single adults were held in standing-room-only-conditions for a week, and at another, some single adults were held more than a month in overcrowded cells.[50]

55.      The July OIG report further described reporting from doctors in Texas who care for children released from these facilities.  These doctors reported that at least six migrant children died in federal custody or shortly after their release.[51]  They recounted "children having lifesaving medication taken away, or released with serious ailments but without any medical records from the time they were detained."[52]  Parents and children

---

[48] Off. of Inspector Gen., U.S. Dep't of Homeland Sec., OIG-19-51, *Management Alert – DHS Needs to Address Dangerous and Prolonged Detention of Children and Adults in the Rio Grande Valley* (Jul. 2, 2019), https://www.oig.dhs.gov/sites/default/files/assets/2019-07/OIG-19-51-Jul19.pdf.

[49] *Id.*

[50] *Id*.

[51] *Id*.

[52] Zolan Kanno-Youngs, *Squalid Conditions at Border Detention Centers, Government Report Finds*, N.Y. TIMES (July 2, 2019), https://www.nytimes.com/2019/07/02/us/politics/border-center-migrant-detention.html.

Papetti Samuels Weiss McKirgan LLP
Scottsdale Quarter
15169 North Scottsdale Road, Suite 205
Scottsdale, AZ 85254

PSWM

1   alike suffered and continue to suffer physically, mentally, and/or emotionally due to

2   these conditions and the traumatic separation they endured.

3       56.    These inhumane and unsafe conditions violate federal law and policy

4   requiring that minors who are detained by CBP or other DHS agencies, or who are held

5   in HHS custody, be held in "facilities that are safe and sanitary," and that account for the

6   "the particular vulnerability of minors."[53]  These conditions further violate requirements

7   that minors detained by CBP be provided access to toilets and sinks, adequate

8   temperature control and ventilation, drinking water and food, as well as "medical

9   assistance if the minor is in need of emergency services."[54]

10      57.    In February 2020, Judge Bury of the U.S. District Court for the District of

11  Arizona granted a permanent injunction finding that the conditions in detention facilities

12  in Border Patrol's Tucson Sector were unconstitutional.[55]  Judge Bury's order held that

13  "floor-sleeping, with or without a mattress, [offends] 'basic' concepts of decency, as

14  well as reasonable respect for constitutional rights."[56]  The order further held that the

15  detention system failed to meet the most basic human needs because, among other

16  factors, the detention centers were uncomfortably cold, had no beds, the Mylar blankets

17  were insufficient to provide body warmth, the facilities were overcrowded, and sleeping

18  was constantly interrupted.  Plaintiffs here endured similar, if not worse, conditions upon

19  being detained.[57]

22  [53] Stipulated Settlement Agreement ¶ 12.A, *Flores v. Reno*, No. 85-CV-4544 (C.D. Cal. Jan. 17, 1997) (hereinafter "Flores Consent Decree").

23  [54] *Id.*

24  [55] Findings of Fact and Conclusions of Law, *Doe v. Wolf*, No. CV-15-00250-TUC-DCB,

25  (D. Ariz. Feb. 19, 2020), ECF No. 482 (holding "that each of the conditions of confinement existing in the CBP holding cells described above, and all of them together,

26  are presumptively punitive because they are more restrictive than the conditions of confinement described above as existing for pretrial detainees held in jails or prisons…").

27  [56] *Id.* at 36.

28  [57] *Id.*

Papetti Samuels Weiss McKirgan LLP
Scottsdale Quarter
15169 North Scottsdale Road, Suite 205
Scottsdale, AZ 85254

PSWM

### 3.   The Disastrous "Attempt" at Reunification

58.     The government failed to take even the most basic steps to develop a reunification system for separated families.

59.     Despite the fact that tracking separated children was as easy as adding a checkbox to an ORR/DHS referral page,[58] these two agencies primarily responsible for implementing the policy developed no "consistent way to indicate in their data systems children and parents separated at the border" until at least the summer of 2018.[59]

60.     Yet, the government had been on notice from the El Paso Initiative that its databases could not properly track families once the child was separated from the parent. The El Paso Initiative revealed that CBP personnel "relied on local spreadsheets to document family separations," which led to data errors and "prevented ICE and CBP personnel in other locations from seeing where El Paso Sector Border Patrol agents had separated family members."[60]

61.     El Paso sector CBP officials notified CBP headquarters about the lack of functionality to track family separations in their computer systems, but headquarters failed to make any changes or improvements.[61]

62.     In September 2019, DHS OIG noted that the "lack of integration between CBP's, ICE's, and HHS's respective information technology systems hindered efforts to identify, track, and reunify parents and children separated under the Zero Tolerance policy" and that "[a]s a result, DHS has struggled to provide accurate, complete, reliable

---

[58] Oversight of the Trump Administration's Family Separation Policy: Hearing Before the H. Comm. on the Judiciary, at 4 (Feb. 26, 2019) (statement of Scott Lloyd, Senior Advisor, Center for Faith and Opportunity Initiatives, U.S. Dep't of Health and Human Servs.), https://docs.house.gov/meetings/JU/JU00/20190226/108872/HHRG-116-JU00-Wstate-LloydS-20190226.pdf.

[59] U.S. Gov't Accountability Off., GAO-19-163, *Unaccompanied Children: Agency Efforts to Reunify Children Separated from Parents at the Border*, at 21 (Oct. 2018), https://www.gao.gov/assets/700/694918.pdf (hereinafter "GAO Report") ("HHS officials told us that there were no specific procedures to reunite children with parents from whom they were separated at the border prior to the June 2018 court order.").

[60] DHS OIG Report II, *supra* note 13, at 15.

[61] *Id.* at 14–15.

18

data on family separations and reunifications, raising concerns about the accuracy of its reporting."[62]  Although DHS claimed that DHS and HHS had a "central database" containing location information on separated families, OIG found no evidence that such a database existed.[63]

63.    The inaccurate data and lack of a centralized system left parents without the ability to communicate with their children for weeks, or even worse, months. Parents were forced to wait in detention while wondering when, if ever, they would be reunited with their children.  The government's absolute failure to adequately track and reunite families only intensified the damage these families experienced due to the "zero-tolerance" policy.

64.    In an acknowledgement of the enduring psychological harm caused by forcibly taking children from their parents at the border with no guarantee of when or how they would be reunited, Judge Kronstadt of the United States District Court for the Central District of California took the step in November 2019 of ordering the government to immediately make available mental health screenings and treatment to thousands of forcibly separated families who remain in the United States.[64]

**4.    The "Zero-Tolerance" Policy Prompted Severe Public Backlash Yet Family Separations Persisted**

65.    The separation of families prompted widespread public backlash and criticism.  Ravina Shamdasani, a spokeswoman for the Office of the United Nations High Commissioner for Human Rights, stated that the practice of family separation "amounts to arbitrary and unlawful interference in family life, and is a serious violation

---

[62] DHS OIG Report I, *supra* note 5, at 11 ("OIG requested a list of every [noncitizen] child separated from an adult since April 19, 2018, as well as basic information about each child, including the child's date of birth; the child's date of apprehension, separation, and (if applicable) reunification; and the location(s) in which the child was held in DHS custody. It took DHS many weeks to provide the requested data…[m]oreover, the data DHS eventually supplied was incomplete and inconsistent, raising questions about its reliability.").

[63] *Id*.

[64] Civil Minutes, *Ms. J.P. v. Sessions*, No. 2:18-cv-06081-JAK-SK (C.D. Cal. Nov. 5, 2019), ECF No. 251.

Papetti Samuels Weiss McKirgan LLP
Scottsdale Quarter
15169 North Scottsdale Road, Suite 205
Scottsdale, AZ 85254

PSWM

of the rights of the child."[65]  Pope Francis criticized the family separation policy and described the "Zero-Tolerance" policy as "immoral" and "contrary to our Catholic values."[66]  On June 18, 2018,  ProPublica released audio that it had obtained from a CBP facility of children crying in the background after being separated from their families.[67]

66.    After such severe public backlash, then-President Trump relented, and on June 20, 2018, signed an executive order purporting to end the "zero-tolerance" policy. Shifting blame onto Congress, former President Trump stated that it was "unfortunate that Congress's failure to act and court orders have put the administration in the position of separating [noncitizen] families to effectively enforce the law."[68]  This executive order, however, did not address how the thousands of children separated from their families would be reunited.  In fact, a United States Government Accountability Office report noted "that there were no specific procedures to reunite children with parents from whom they were separated at the border."[69]  These reunification procedures came only after a federal judge ordered the government to reunite separated families.[70]

67.    On June 26, 2018, in *Ms. L v. ICE*, Judge Sabraw issued a class-wide

---

[65] Nick Cumming-Bruce, *Taking Migrant Children From Parents Is Illegal, U.N. Tells U.S.*, N.Y. TIMES (June 5, 2018), https://www.nytimes.com/2018/06/05/world/americas/us-un-migrant-children-families.html.

[66] Jason Horowitz, *Pope Francis Criticized Family Separations Before Policy's Reversal*, N.Y. TIMES (June 20, 2018), https://www.nytimes.com/2018/06/20/world/europe/pope-francis-trump-child-separation.html.

[67] Ginger Thompson, *Listen to Children Who've Just Been Separated From Their Parents at the Border*, PROPUBLICA (June 18, 2018, 3:51 PM), https://www.propublica.org/article/children-separated-from-parents-border-patrol-cbp-trump-immigration-policy.

[68] Politico Staff, *Full Text: Trump's Executive Order Ending Family Separations*, POLITICO (June 20, 2018, 4:12 PM), https://www.politico.com/story/2018/06/20/full-text-trump-executive-order-family-separations-transcript-658639.

[69] GAO Report, *supra* note 59, at 21 ("HHS officials told us that there were no specific procedures to reunite children with parents from whom they were separated at the border prior to the June 2018 court order.").

[70] *See Ms. L.*, 310 F. Supp. 3d at 1136, 1149–50.

Papetti Samuels Weiss McKirgan LLP
Scottsdale Quarter
15169 North Scottsdale Road, Suite 205
Scottsdale, AZ 85254

PSWM

1   preliminary injunction and ordered the government to reunify families.[71]  Previously, the

2   court had held that the plaintiffs had stated a cognizable claim for violation of their

3   substantive due process rights to family integrity under the Fifth Amendment to the

4   United States Constitution based on the government's practice of separating the

5   plaintiffs from their minor children.[72]  After the executive order was issued, Judge

6   Sabraw recognized that the language of the executive order was not absolute and that it

7   was silent on the issue of reuniting families.[73]  Crucially, the government's counsel

8   admitted there was no procedure in place for the reunification of separated families.[74]

9   As a result, the class-wide preliminary injunction, among other things, prohibited the

10  government from separating families absent a determination that the parents were unfit

11  or presented a danger to the child.[75]  The injunction also prohibited the deportation of

12  any detained parent before reunification with his or her separated children.  Further, it

13  mandated the reunification of class members with their children within 30 days if the

14  child was over five years of age and within 14 days if the child was under five years of

15  age.

16       68.     Despite the *Ms. L.* court's injunction and its clear condemnation of family

17  separations, families remain unlawfully separated to this day.  The government

18

19  _____

    [71] *Id.*

20  [72] *Id.* at 1143 (holding "[o]n the contrary, the context and circumstances in which this
    practice of family separation [was] being implemented support a finding that Plaintiffs

21  have a likelihood of success on their due process claim").

    [73] *Id.*

22  [74] *Id.* at 1145 (holding "[t]hese situations confirm what the Government has already

23  stated: it is not affirmatively reuniting parents like Plaintiffs and their fellow class
    members for purposes other than removal.  Outside of deportation, the onus is on the

24  parents, who, for the most part, are themselves in either criminal or immigration
    proceedings, to contact ORR or otherwise search for their children and make application

25  for reunification under the TVPRA.  However, this reunification procedure was not
    designed to deal with the present circumstances. . . . Placing the burden on the parents to

26  find and request reunification with their children under the circumstances presented here
    is backwards.  When children are separated from their parents under these

27  circumstances, the Government has an affirmative obligation to track and promptly
    reunify these family members").

28  [75] *Id.*

Papetti Samuels Weiss McKirgan LLP
Scottsdale Quarter
15169 North Scottsdale Road, Suite 205
Scottsdale, AZ 85254

PSWM

21

experienced delays in reunifying families separated before the *Ms. L.* injunction because there was no centralized database tracking which child belonged to which parent.[76]  In addition, the Trump administration continued to separate families at the border notwithstanding the unequivocal injunction and the executive order purporting to end the practice.[77]

69.    Between the executive order and December 2019, more than 1,100 additional migrant children were separated from their parents, due to what was supposed to be a narrow exception to the executive order—namely that the parent poses a danger or is unfit to take care of the child.[78]  In some instances, these separations were triggered by "minor offenses committed by the parents, such as traffic violations."[79]  The government's own data suggests the number could be even higher, due to wildly inconsistent record keeping.[80]

70.    Given the Trump administration's admissions regarding the purpose of the zero-tolerance policy, the detention centers' squalid conditions, and the lack of ***any*** adequate system to reunify families, it is clear that the government instituted and implemented this policy to inflict emotional distress on the families it separated.  It succeeded with devasting consequences for Plaintiffs Elias and Jocelin.

---

[76] *Id.* at 1143–44; Joint Status Report at 4, *Ms. L v. U.S. Immigr. & Customs Enf't*, No. 18-cv-00428 (S.D. Cal. July 26, 2018), ECF No. 159 ("In addition, according to Defendant's own data, dozens of separated children still have not been matched to a parent.  Moreover, close to a thousand parents remain separated from their children. This includes nearly 500 parents who were removed from the country, most likely without their children.").

[77] John Washington, *The Government Has Taken At Least 1,100 Children From Their Parents Since Family Separations Officially Ended*, THE INTERCEPT (Dec. 9, 2019, 7:56 AM), https://theintercept.com/2019/12/09/family-separation-policy-lawsuit/; Camilo Montoya-Galvez, *The U.S. Continues to Separate Migrant Families.  For One Father, A Miscommunication Proved Costly*, CBS NEWS (Dec. 16, 2019, 6:02 AM), https://www.cbsnews.com/news/family-separation-1134-migrant-families-separated-since-end-of-trump-zero-tolerance-policy-aclu/.

[78] Montoya-Galvez, *supra* note 77.

[79] *Id.* (explaining how a father and son were separated at the border after a CBP agent claimed that the father and son were not related, even after the father provided the CBP agent with a birth certificate proving he was the father)

[80] Washington, *supra* note 77.

22

**B.    PLAINTIFFS' FACTUAL ALLEGATIONS**

**1.    Elias and His Minor Daughter, Jocelin, Seek Asylum in the United States and are Taken Into CBP Custody**

71.    On or around May 1, 2018 at approximately 11:40 p.m., Elias entered the United States at the U.S.-Mexico border near Yuma, Arizona with his minor daughter, Jocelin.  They arrived in a group with different families, as well as with a separate unaccompanied minor who was not a member of Elias's family.  Before entering Arizona, Elias and others in his group spoke with immigration officials who allowed them to cross the border.  Shortly after crossing the border, however, CBP agents apprehended them, throwing them to the ground.  Jocelin immediately began to cry and asked her father what the agents were going to do to them.  Elias, consumed by fear and uncertainty, was unable to respond to or reassure his daughter.  A CBP agent proceeded to forcibly throw Elias and Jocelin into a vehicle, injuring Elias's knee.

72.    After taking them into custody, the CBP agents took Elias and Jocelin to the Yuma County Detention Center in Yuma, Arizona where immigration officers confiscated their belongings, including Elias's identification card and his daughter's birth certificate.  At the time they were apprehended, Jocelin developed a high fever.  Elias and Jocelin were forced to wait overnight in the detention center before the facility provided Jocelin with any medical care.  When Jocelin finally received medical attention, the doctor prescribed her medication.  Shortly thereafter, however, the immigration officers confiscated the medication.  When Jocelin asked for the medication, the immigration officers claimed they could not locate it due to changes in shift.  Jocelin's fever persisted, and she never received her medication.

73.    Elias and Jocelin were locked in a cell with about 90 other people for three days at Yuma.  The cell was so cold that it has been colloquially referred to as "*la hielera*," which means the "icebox" in Spanish.  There were no beds in *la hielera*.  There was not enough space to lay down on the floor and there were not enough aluminum blankets for all detainees.  Everyone shared a sink and a toilet.

74.    The inhumane conditions did not end there.  The only food Elias and Jocelin were given each day was one dehydrated ramen noodle cup, uncooked and without water.  The only water available was from a sink near the toilet.  At some point in time, Elias asked the immigration officers for water, and the immigration officers responded by asking him, "Who told you to come here?"  Elias remained quiet and neither he nor Jocelin was given any water.

75.    On a separate occasion, the immigration officers asked Elias if he came to the United States to work.  Elias responded that there were people in Guatemala who did not like him.  Rather than assess whether Elias had a basis for an asylum claim based on a well-founded fear of persecution, as required by law, the immigration officers proceeded to tell Elias that whether people liked him or not was not "their problem." These inhumane conditions and the degrading treatment prompted Elias to question why he and his daughter ever came to the United States to seek safety.

## 2.    The United States Takes Jocelin from Elias

76.    At some point in time, Elias began to see immigration officers separating children from their parents.  This made him especially fearful and he prayed that the same would not happen to him and his daughter.  On the third day of their detention, immigration officers asked him to sign several documents.  The documents were in English and the immigration officers did not explain their contents or their import.  Even though he did not understand what the documents said, when the immigration officers became aggressive and demanded that he sign, Elias relented out of fear.

77.    Shortly thereafter, immigration officers asked Elias to bathe Jocelin.  After he bathed her, the immigration officers took Jocelin away from him.  Elias tried to hold his daughter, but the immigration officers forcibly pulled on his arms and demanded that he let her go.  Jocelin began to cry and asked her father, "Why did you bring me here? You're leaving me alone."

78.    The immigration officers told Elias that Jocelin was going to be taken to Houston, Texas and that he would be sent there after her.  Elias would later learn that the

1   immigration officers lied to him.  That was the last time Elias saw his daughter for 4

2   months and 22 days.

3   **3.**   **Elias's Continued Mistreatment in the Yuma County Detention**
        **Center**

4

5   79.   After his daughter was taken from him, Elias was not informed of his

6   daughter's whereabouts, and all his requests for information were ignored.  He was not

7   allowed to use the phone to try to locate her.  When he asked immigration officers for his

8   daughter's location, they told him they were not responsible for looking after her.  For

9   the remaining ten days that Elias was detained at Yuma, he suffered tremendously under

10  terrible conditions.  He had been forcibly separated from his eight year old daughter and

11  then was denied any information about her location or condition.  He was also subject to

12  unnecessarily cruel and inhumane treatment.  He was not given an opportunity to take a

13  shower or brush his teeth.  He found it difficult to sleep and could not eat the uncooked

14  noodles he was given.  Despite experiencing diarrhea for three days and vomiting, he

15  was denied any medical treatment.

16  80.   At some point in time, Elias fainted due to lack of food.  The other

17  individuals detained with Elias alerted the immigration officers that Elias had fainted,

18  but the immigration officers did not provide him with medical care.  The other

19  individuals who were detained began to give Elias water to revive him.  Elias believes

20  that he likely would have died if the other detainees in the detention center had not

21  helped him.

22  81.   On a separate occasion, Elias and other detainees in *la hielera* were

23  praying in a corner when the immigration officers approached them and accused them of

24  plotting an escape from the facility.  The immigration officers proceeded to place Elias

25  in a separate holding cell for two days.  Elias refers to this separate holding cell as the

26  "*perrera*," a room where they detained individuals who were "misbehaving."  The room

27  was the size of a restroom and was crammed with more than twenty people in it.  There

28  was barely any room to stand, much less sit or sleep on the floor.  Elias did not receive

Papetti Samuels Weiss McKirgan LLP
Scottsdale Quarter
15169 North Scottsdale Road, Suite 205
Scottsdale, AZ 85254

PSWM

food while he was in the *perrera* and was forced to drink water from the sink.

**4.    Elias is Transferred to the Florence Detention Center and has Limited Contact with Jocelin**

82.    On or around May 13, 2018, Elias was transferred to Florence, Arizona where he was held in a separate detention center.  Although the conditions in Florence were more humane, Elias continued to suffer from anxiety and depression due to the separation from his daughter.  When he asked for his daughter's location, immigration officials told Elias that he needed to fill out a form in English.  Because Elias did not know how to read or write in English, Elias was unable to fill out the form and was not offered any assistance.

83.    On or around May 15, 2018, Elias received a call from a social worker who told him that his daughter was in a detention center in Miami, Florida.  His daughter was inconsolable and had begged to speak with her father.  When Elias and his daughter finally spoke, he was unable to learn anything from her as she could not stop crying.

84.    For the remainder of his detention, Elias was permitted to speak to his daughter once a week.  During these phone calls, she always cried and begged to see him.  At times, she would tell him that he was a bad father and ask why he left her alone.  Elias became extremely depressed and felt completely helpless.  He began to have suicidal thoughts and wondered if he could live without his daughter.  The other detainees at the Florence detention center convinced him not to commit suicide.

85.    At some point in time, the immigration officers told Elias that he would be deported to Guatemala the next day.  Elias asked to speak with an attorney or judge, but his request was denied.  Shortly thereafter, Elias contacted the Guatemalan consulate to determine whether he could leave with his daughter.  The consulate told him that his daughter would arrive in Guatemala after him and that there was no way for them to leave together.

86.    On the day of his deportation, Elias was asked to sign documents in English that he did not understand.  Elias asked the immigration officers if he could be

26

reunited with his daughter first and then be deported to Guatemala together, but the immigration officers told him that was not possible. Instead, the immigration officers told him that if he signed the papers he and his daughter would be reunited faster. Elias proceeded to sign the papers believing that it would reunite him with his daughter faster. Elias would later learn that the immigration officers lied to him again.

87.     Elias was deported on or around May 21, 2018. For the 21 days Elias was in the United States, he lost more than 20 pounds. When he arrived in the United States, he weighed approximately 148 pounds. He weighed 127 pounds when he left.

### 5.     Jocelin is Placed in ORR Custody More than 2,000 Miles Away from Her Father and Faces Continued Mistreatment There

88.     On or about May 3, 2018, Jocelin was forcibly separated from her father in Yuma, Arizona and sent to a detention center in Miami, Florida, without a parent, guardian, or family member. Jocelin was terrified. Compounding her fear from being forcibly removed from her father, she was frightened of flying on an airplane for the first time. When she arrived at the detention center, she was asked to take a shower. After she showered, she did not have any clothes to change into and was forced to wait naked for an hour until immigration officers brought her clothes. Immigration officers then gave her vaccinations without any prior authorization from her parents. After she was given the vaccinations, she became sick and was sent to the hospital. She cried at the hospital and asked God why this was happening to her.

89.     The next day, Jocelin was sent to school at the detention center. She was not able to play outside because she did not have any tennis shoes. Jocelin asked for tennis shoes, but the immigration officers told her that there were no tennis shoes there. It was only after Jocelin's social worker provided her with tennis shoes that Jocelin was finally able to go outside.

90.     While Jocelin was detained, she would often go into her room, close the windows, and fall asleep. Sleeping helped her stop thinking about her conditions. When she was awake, she could only think about her family, which prompted her to cry. At

Papetti Samuels Weiss McKirgan LLP
Scottsdale Quarter
15169 North Scottsdale Road, Suite 205
Scottsdale, AZ 85254

PSWM

some point, a woman in the detention center asked Jocelin to stop crying, and Jocelin responded that she did not know how she could, given that she did not have her father.

91.     Due to Jocelin's severe depression and inconsolable crying from being forcibly removed from her father, a case manager contacted Jocelin's mother in Guatemala and asked whether they could put Jocelin up for adoption.  Shocked by the request, her mother refused and demanded that the immigration officers send Jocelin back to Guatemala.  In late summer 2018, Jocelin received a new case manager who informed her that she was going back to Guatemala.  Jocelin was relieved and excited to see her mother and sister again but at the time she did not know that her father had already returned to Guatemala.  Her family kept this from her out of fear that it would cause her more distress, knowing that she was completely alone in the United States, without a parent.  On or around September 25, 2018, Jocelin was reunited with her family, nearly five months after the forced separation.

**6.     The Harmful and Lasting Effects of Separation and Detention on Elias and Jocelin**

92.     As a result of the separation and prolonged detention, Elias and Jocelin continue to experience both physical and psychological symptoms.

93.     When Jocelin was in the United States, Elias would cry uncontrollably.  He did not feel like the same person.  When he was deported to Guatemala, he turned to alcohol to relieve his pain and suffering.  He had sold all his belongings, including his house, to be able to travel to the United States, and dreamed of providing a better education and life for his family.  Because he did not accomplish this goal, Elias felt defeated when he returned to Guatemala.  Elias continues to suffer from anxiety and depression.  He often cannot sleep at night because he has nightmares.  He often dreams that he is crossing the border again and that he is being thrown to the ground.  Once he is thrown to the ground, he dreams that people begin to strangle him, and he wakes up in terror.  He does not eat much and finds it difficult to work as often as he used to do.  He struggles to talk about these experiences as it forces him to relive the trauma.

94.    Jocelin has become more rebellious and does not do what she is told. She often says she hates her father, which has caused Elias deep pain. She struggles to talk about the forced separation and cries when she is asked to. She has no appetite and has problems sleeping with the lights off because she feels like people are touching her. Jocelin did not act this way prior to coming to the United States.

95.    DHS arrested, or caused the arrest of, detained and took custody of Elias and Jocelin for a total of approximately 150 days. During the vast majority of that period, they were separated, and a minor child was kept in custody away from any parent. While in custody and during transit, Elias and Jocelin were grossly mistreated and denied basic medical care. The immigration officers engaged in gross negligence, abuse of process, negligent hiring, training, and supervision, and caused intentional and negligent infliction of emotional distress.

## C.    THE GOVERNMENT'S SEPARATION OF ELIAS AND JOCELIN WAS UNCONSTITUTIONAL

96.    The government's family separation policy intentionally violated the constitutional rights of those separated, including Elias and Jocelin's substantive due process right to family integrity. The separation policy was motivated by discriminatory animus towards Latino immigrants of Central American origin in particular, who were targeted for deprivation of these fundamental rights.

97.    The United States Supreme Court has consistently recognized that the parent-child relationship is constitutionally protected, regardless of the parent or child's citizenship status.[81]

98.    And the freedom from discrimination by the government on the basis of race or national origin has also long been recognized as "extend[ing] to anyone, citizen or stranger, who is subject to the laws of a State," even those not lawfully present.[82]

99.    Yet the United States, through this unconstitutional policy, forcibly

[81] *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978); *Wisconsin v. Yoder*, 406 U.S. 205, 231–33 (1971); *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944).

[82] *Plyler v. Doe*, 457 U.S. 202, 215 (1982) (emphasis removed).

29

Papetti Samuels Weiss McKirgan LLP
Scottsdale Quarter
15169 North Scottsdale Road, Suite 205
Scottsdale, AZ 85254

PSWM

separated Central American immigrant children from their parents, including Elias and Jocelin, sent children thousands of miles away without informing their parents of their location, neglected to provide a means for children to speak with their parents, failed to provide basic health and safety care in violation of federal law, and failed to provide an adequate system to track the children or ensure the reunification of families.

100.    As Judge Sabraw held in *Ms. L*, the government's "egregious" and "outrageous" action with respect to separating parents from children likely violated due process.  Judge Sabraw described the policy and practice as one that "shocks the conscience" and "is so brutal and offensive that it does not comport with traditional ideas of fair play and decency."[83]

101.    Additionally, Judge Friedman of the United States District Court for the District of Columbia held in a related suit that "nothing in federal law suggests that deterring immigration by indefinitely separating families once the parents have been transferred to immigration custody is a compelling or legitimate government objective."[84]

102.    The federal government here deliberately violated Plaintiffs Elias's and Jocelin's constitutional rights, including their right to family integrity and equal protection, and purposefully inflicted trauma on Plaintiffs—a trauma they will carry with them for the rest of their lives.

<u>**CLAIMS FOR RELIEF**</u>

<u>**COUNT ONE**</u>

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

103.    Plaintiffs re-allege each allegation in the preceding paragraphs 1 through 102 as though fully set forth here.

104.    By engaging in the acts described in this Complaint, Defendant, acting by

Papetti Samuels Weiss McKirgan LLP
Scottsdale Quarter
15169 North Scottsdale Road, Suite 205
Scottsdale, AZ 85254

PSWM

---

[83] *Ms. L.*, 310 F. Supp. 3d at 1142, 1145–46 (internal quotations and citation omitted).
[84] *Jacinto-Castanon de Nolasco v. U.S. Immigr. & Customs Enf't*, 319 F. Supp. 3d 491, 502 (D.D.C. 2018).

and through the federal agencies, federal officials, and federal employees referenced above, engaged in extreme and outrageous conduct with an intent to cause, or with a reckless disregard of the probability of causing, Plaintiffs to suffer severe emotional distress.

105. Defendant intended to cause, and did cause, Plaintiffs to suffer severe emotional distress by forcibly separating Elias and Jocelin from one another without their consent, despite the obvious trauma and terror caused by the separation.

106. Defendant intended to cause, and did cause, Plaintiffs to suffer severe emotional distress by separating Elias and Jocelin while both were being held in immigration custody and failing to reunify them in the United States.

107. Defendant intended to cause, and did cause, Plaintiffs to suffer severe emotional distress by, *inter alia*, failing to develop and implement a system for tracking the existence of the parent-child relationship, withholding from Elias any information about Jocelin's whereabouts or well-being, failing to allow Elias and Jocelin to communicate with each other, and failing to give any indication that Elias and Jocelin would ever be reunited.

108. Defendant further intended to cause, and did cause, Plaintiffs to suffer severe emotional distress by subjecting Plaintiffs to inhumane detention conditions prior to and during their separation.

109. Defendant intended to cause, and did cause, Plaintiffs to suffer severe emotional distress by failing to plan for or obtain resources to meet the increase in children designated as unaccompanied minors as a result of the family separation policy, failing to provide a child welfare or child safety justification for forcibly separating children from their parents, failing to track families, and failing to develop any sort of reunification plan until ordered to do so by a federal judge.

110. Defendant's behavior was extreme and outrageous under the circumstances.

111. As a direct and proximate result of that conduct, Plaintiffs suffered severe

Papetti Samuels Weiss McKirgan LLP
Scottsdale Quarter
15169 North Scottsdale Road, Suite 205
Scottsdale, AZ 85254

PSWM

emotional distress throughout their time in Defendant's custody and continue to suffer the lasting effects of that distress today.

112.    Under the Federal Torts Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680, the United States is liable to Plaintiffs for intentional infliction of emotional distress.

### COUNT TWO

### NEGLIGENCE

113.    Plaintiffs re-allege each allegation in the preceding paragraphs 1 through 112 as though fully set forth here.

114.    Defendant, acting by and through the federal agencies, federal officials, and federal employees referenced above, had a duty to Plaintiffs to act with ordinary care and prudence so as not to cause harm or injury to Plaintiffs.  They also had mandatory, non-discretionary duties including, but not limited to, those imposed by the United States Constitution, the *Flores* consent decree, federal statute, and federal regulations.

115.    Defendant acted unreasonably by violating their duties while Plaintiffs were in Defendant's custody.

116.    Defendant violated those duties by, *inter alia*, forcibly separating Elias and Jocelin from one another without their consent and despite the obvious trauma and terror caused by the separation.

117.    Defendant violated those duties by, *inter alia*, separating Elias and Jocelin while both were being held in immigration custody and failing to reunify them in the United States.

118.    Defendant violated those duties by, *inter alia*, failing to develop and implement a system for tracking the existence of the parent-child relationship, withholding from Elias any information about Jocelin's whereabouts or well-being, failing to allow Elias and Jocelin to communicate with each other, and failing to give any indication that Elias and Jocelin would ever be reunited.

119.    Defendant violated those duties by, *inter alia*, subjecting Plaintiffs to

Papetti Samuels Weiss McKirgan LLP
Scottsdale Quarter
15169 North Scottsdale Road, Suite 205
Scottsdale, AZ 85254

PSWM

inhumane detention conditions prior to and during their separation.

120.    Defendant violated those duties by, *inter alia*, failing to plan for or obtain resources to meet the increase in children designated as unaccompanied minors as a result of the family separation policy, failing to provide a child welfare or child safety justification for forcibly separating children from their parents, failing to track families, and failing to develop any sort of reunification plan until ordered to do so by a federal judge.

121.    By engaging in the acts alleged herein, Defendant failed to act with ordinary care and breached its duty of care owed to Plaintiffs.

122.    As a direct and proximate result of the referenced conduct, Plaintiffs suffered substantial damages.

123.    Under the Federal Torts Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680, the United States is liable to Plaintiffs for negligence.

## COUNT THREE

## LOSS OF CHILD'S CONSORTIUM

124.    Plaintiffs re-allege each allegation in the preceding paragraphs 1 through 123 as though fully set forth here.

125.    As a result of the acts alleged herein, Jocelin suffered severe, permanent, and disabling injuries.

126.    Jocelin must now cope with the long-term mental health effects and trauma caused by the Defendant, federal officers, and officials referenced above.

127.    These injuries substantially interfere with the capacity of Elias to interact with Jocelin in a normally gratifying way.

128.    Elias and Jocelin's father-daughter relationship is severely strained due to Defendant's actions.  Jocelin continues to blame Elias for the separation, she struggles to talk about the forced separation and cries when she is asked to, has a reduced appetite, and struggles to sleep with the lights off because she feels like people are touching her.

129.    Under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680, the

Papetti Samuels Weiss McKirgan LLP
Scottsdale Quarter
15169 North Scottsdale Road, Suite 205
Scottsdale, AZ 85254

PSWM

1  United States is liable to Elias for loss of consortium.

2  **PRAYER FOR RELIEF**

3  WHEREFORE, Plaintiffs respectfully request:

4  A.  Award compensatory damages to Plaintiffs for the harms they suffered as a

5  result of Defendant's unconstitutional and unlawful conduct;

6  B.  Award Plaintiffs their costs and attorneys' fees pursuant to, among other

7  provisions, the Equal Access to Justice Act, 28 U.S.C. § 2412; and

8  C.  Award such other and further relief as the Court deems just and

9  appropriate.

10  **JURY TRIAL DEMAND**

11  Plaintiffs hereby demand a jury trial.

12  DATED this 27th day of May, 2022.

13  PAPETTI SAMUELS WEISS MCKIRGAN LLP

14  /s/Randy Papetti
    Randy Papetti
15  Jennifer Lee-Cota

16

17  ORRICK, HERRINGTON & SUTCLIFFE LLP

18  Karen G. Johnson-McKewan*
    Russell P. Cohen*
    Ryann R. McMurry*
19  Megan B. Benton*

20  *Pro hac vice applications forthcoming

21  *Attorneys for Plaintiffs*

22

23

24

25

26

27

28

Papetti Samuels Weiss McKirgan LLP
Scottsdale Quarter
15169 North Scottsdale Road, Suite 205
Scottsdale, AZ 85254

PSWM